[File No. 6140.]

NEIL WHEELER, Respondent, v. BOYER FIRE APPARATUS COMPANY, a Corporation, Appellant.

(248 N. W. 521.)

Opinion filed May 13, 1933.

*E. R. Sinkler* and *G. O. Brekke,* for appellant.

*B. H. Bradford* and *G. S. Wooledge,* for respondent.

BURKE, J.  This is an action to recover commissions claimed to be due the plaintiff from the defendant under a sales contract. The plaintiff is a foreign corporation and the summons was served upon one P. L. Speed.  After the service of the summons, the defendant appeared specially and objected to the jurisdiction of the court on the ground that no legal service of the summons had been made upon the defendant and moved to dismiss the action.  The motion was based upon the affidavit of P. L. Speed, upon whom the summons was served, and who states, in his affidavit, that he is the soliciting agent for the defendant company, working on a salary and commission on sales accepted; that he is furnished with advertising diagrams and pictures of the various

articles manufactured by the defendant company at their place of business, to-wit: Logansport, Indiana; that his sole and only authority is to solicit orders and that when such orders are solicited or obtained by said affiant, the said orders are sent to the defendant at Logansport, Indiana for their approval and acceptance and that the defendant had no property in the state of North Dakota.

There is also an affidavit by S. O. Cook, vice president of the defendant company, who states that no officer of the company has been served with the summons in said cause nor has the defendant waived the service of a summons in said cause, and that the defendant is not doing business in the state of North Dakota.

The plaintiff resisted the motion for dismissal, filing his affidavit, stating that on or about the 10th day of July, 1930, the plaintiff was notified by the defendant that the contract between the plaintiff and defendant had been terminated and on or about the 15th day of July, 1930, affiant received a letter from the defendant stating that P. L. Speed had been appointed sales representative for them in this territory and that affiant should turn over to said P. L. Speed all advertising and sales material in his possession at that time belonging to defendant; that the said P. L. Speed had been acting as sales representative and apparatus engineer for defendant in the territory covered by affiant's contract at all times since sometime prior to the 15th day of July, 1930; that the said P. L. Speed had closed contracts at Steele and Jamestown, North Dakota and also at Beach, North Dakota, during July and August, 1930; that at all times since his appointment as sales representative in July, 1930, the said P. L. Speed has been engaged solely as agent and representative for the defendant in the State of North Dakota, is a resident of Minot, North Dakota, and that the cause of action set forth in the complaint arose within the state of North Dakota.

The motion to dismiss was overruled, a jury was waived, the case was tried to the court, and findings of fact and conclusions of law favorable to the plaintiff were made upon which judgment was entered and the defendant appeals from the judgment and from an order denying a new trial.

The first question arises on the specification of error namely: that the court erred in denying defendant's motion to dismiss the action on

the ground that no legal service of the summons had been made upon the defendant.

It is conceded that the defendant company has not appointed the secretary of state as agent, upon whom service of process may be made and that service of the summons, if it could be made at all, would have to be made under subdivision 6 of Section 7426, Compiled Laws, 1913, which reads as follows: "In all cases when a foreign corporation, joint stock company or association shall not have appointed either the secretary of state or commissioner of insurance, as the case may be, as its lawful attorney upon whom service of process may be made, and such foreign corporation, joint stock company or association cannot be personally served with such process according to the provisions of subdivision 5 of this section, it shall be lawful to serve such process on any person who shall be found within this state acting as the agent of, or doing business for, such corporation, joint stock company or association. But the service provided for in this subdivision can be made upon a foreign corporation, joint stock company or association only when it has property within the state or the cause of action arose therein."

It is admitted that Mr. Speed was, at the time of the service of the summons on the defendant, engaged in soliciting sales for the manufactured products of the defendant in the state of North Dakota. Mr. Speed states, in his affidavit, that he is the soliciting agent for the Boyer Fire Apparatus Company and it appears that Mr. Speed had closed contracts, or taken orders, at Steele, Jamestown, and Beach, North Dakota prior to the 15th day of July, 1930, and that he was devoting his time to soliciting orders for the sale of defendant's goods in the state of North Dakota at the time of the service of the summons upon him.

It is the contention of appellant that since the contracts, or orders, procured by Mr. Speed were subject to the approval of the home office at Logansport, Indiana, that they did not have any agent in North Dakota upon whom service could be made.

Clearly, under the statute, if a foreign corporation has not appointed the secretary of state as its lawful attorney upon whom service of process may be made, it is "lawful to serve such process on any person who shall be found within this state acting as the agent of, or doing

business for, such corporation." He may be an agent but it is not absolutely necessary. Lawful service may be made on "any person who shall be found within this state (1) acting as agent of, or (2) doing business for, such corporation."

While plaintiff was sales agent for the defendant company he received many letters from the company urging him to complete sale prospects. Under date of April 7, 1930, in a letter introduced as exhibit "K," among other things the defendant said: "It is either a case of definite results or we have to look for other sales representation. You certainly have had sufficient experience now to enable you to do a good volume of business and make some money for yourself and your company, provided your experience is worth anything to you. . . . On the strength of your statement in your letter that you have quite a few prospects, two of which you expect to close in April and several in the near future, we are wiring you at Aberdeen, enclosing a confirmation of our wire, in which we are telling you that we are willing to continue until April 25, which will give you an opportunity to close these livest prospects of yours and if you close one by that date, we are then willing to continue indefinitely. The last thing in the world we want to do is to change field representatives as these changes are expensive and involve going all through the educational stages again; however, we must have a satisfactory volume of business and the only way we can get it is through our field organization. If the individual is not producing, then we have to make changes until we do get a satisfactory volume of business from every territory." There are many other similar letters in the record. Under date of June 9, 1930, the defendant wrote the plaintiff among other things (exhibit "Q") stating "Business has not been good in any line and it is not good with us and we have to hustle and get some contracts if we are going to be able to continue to stay in business. It is getting to a point where it is hard sledding for all of us and there is only one way to ease up this situation and that is for you boys in the field to shoot in a bunch of contracts. We received four contracts for last week, which is fine for one week, but we have to get a flock of contracts to make up for the many dull weeks we have been having. . . . We just have to have some business from you this month, Neil and it does not make any difference

whether you get it in South or North Dakota, just so long as you get it."

Mr. Speed had been agent for the defendant company and secured the services of the plaintiff for the defendant when his agency terminated. The letter from the defendant to the plaintiff terminating plaintiff's contract, ordered the plaintiff to turn over all the property of the defendant in his possession to Mr. Speed and Mr. Speed said that he again became the active agent of the defendant, working on a salary and commissions on sale contracts solicited by him, which were approved by the defendant. At the trial he testified: "I always understood that they (agents) were hired on a commission basis. . . . I hired a man since on the same conditions I hired him and sent him into South Dakota. . . . On a straight commission basis." On cross-examination he said he had a written contract with the defendant company up to March 1st, 1932. This contract was not introduced in evidence but his testimony is that he was working on a commission basis and the record shows that the contract between the plaintiff and defendant is their regular commission form contract. It is entitled "Sales Contract." It provides: "That for and in consideration of the mutual agreements herein contained, the party of the second part thereby promises and agrees to act as salesman of said party of the first part and to devote his entire time thereto and to faithfully, honestly, and diligently perform such duties as may be required of him in that capacity and do so in accordance with company policies that may be outlined to him from time to time." After providing for commissions, payable to the salesman, the contract continues "It is particularly understood by the salesman that all sales and settlements are to be made in the name of Boyer Fire Apparatus Company and party of the second part further agrees as a part of his duties to promptly make collections in the name of the company on all apparatus and equipment sold by him and to mail the same to the company on the same day collection is made." Here is a direct agreement by the terms of which the party of the second part, a salesman, agrees to sell the defendant's products in the state of North Dakota and in the northern half of South Dakota and to promptly make collection in the name of the company and to mail collections to defendant on the day of collection. Accompanying the Speed affidavit is a copy of the contract which Mr. Speed alleges

in his affidavit is the contract signed by the purchaser and forwarded to the defendant company for approval. It states: "All agreements are contingent upon delays resulting from strikes, accidents, fires, commandeering of plant or other demands of the United States Government, delays in transportation and all other causes beyond the control of the Boyer Fire Apparatus Company. . . .

"This agreement, made by and between the Boyer Fire Apparatus Company, of Logansport, Indiana, party of the first part, and —————————— party of the second part.

"Witnesseth: That the party of the first part agrees to sell, (that is, this defendant company agrees to sell) upon the terms and conditions following, the apparatus and equipment herein before described, which is in accordance with the specifications and guarantee attached, the same being a part of this agreement and contract.

"Delivery to be made —————————— within ——————— working days after receipt and approval of this contract, duly executed, . . . (Then follows a warranty.)

"The party of the second part agrees to purchase and pay for the aforesaid apparatus, as aforesaid the sum of $ ——————— Dollars ($———————) in cash, upon delivery and acceptance of the apparatus.

"The party of the first part agrees to promptly test such apparatus and the party of the second part agrees to accept it, if in accordance with contract, within five days after the delivery at its destination.

"All contracts are taken subject to the written acceptance of the party of the first part by its duly authorized officers. At the request of the party of the first part, a written opinion of the attorney for the political subdivision, as to the power of that political subdivision to make this contract, will be furnished by the party of the second part. (The fire apparatus equipment is for the extinguishing of fires and the sales are made to municipalities and this last provision is for the purpose of determining the authority of the municipality to enter into such contract.) . . . .

"Witness our hands and official seal this ——— day of ———,
1930.

"Boyer Fire Apparatus Company.

"By ——————————————

Vice-Pres.    Sec'y and Treas.

"Party of the first part.

"Party of the second part."

The record shows that at the time of the service of the summons upon Speed, deals had been closed with the municipalities of Steele, Jamestown and Beach, North Dakota. The defendant company had been doing business in this way in the state for years. During the year that the plaintiff was sales agent of the defendant, notwithstanding the depression, his commissions amounted to over two thousand dollars.

In the case of International Harvester Co. v. Kentucky, 234 U. S. 579, at page 583, 58 L. ed. 1479, 1481, 34 S. Ct. 944, the United States Supreme Court says:

"For some purposes a corporation is deemed to be a resident of the state of its creation; but when a corporation of one state goes into another, in order to be regarded as within the latter it must be there by its agents authorized to transact its business in that state. The mere presence of an agent upon personal affairs does not carry the corporation into the foreign state. It has been frequently held by this court, and it can no longer be doubted, that it is essential to the rendition of a personal judgment that the corporation be 'doing business' within the state. St. Louis S. W. R. Co. v. Alexander, 227 U. S. 218, 226, 57 L. ed. 486, 488, 33 S. Ct. 245, Ann. Cas. 1915B, 77, and cases there cited. As was said in that case, each case must depend upon its own facts, and their consideration must show that this essential requirement of jurisdiction has been complied with, and that the corporation is actually doing business within the state.

"In the case now under consideration the court of appeals of Kentucky found, with warrant for the conclusion, that the Harvester Company's method of conducting business might be shown to the best

advantage from the general instruction of the company to its agents, of date November 7, 1911, as follows:

" 'The company's transactions hereafter with the people of Kentucky must be on a strictly interstate commerce basis. Travelers negotiating sales must not hereafter have any headquarters or place of business in that state, but may reside there.

" 'Their authority must be limited to taking orders, and all orders must be taken subject to the approval of the general agent outside of the state, and all goods must be shipped from outside of the state after the orders have been approved. Travelers do not have authority to make a contract of any kind in the state of Kentucky. They merely take orders to be submitted to the general agent. If anyone in Kentucky owes the company a debt, they may receive the money, or a check, or a draft for the same, but they do not have any authority to make any allowance or compromise any disputed claims. When a matter cannot be settled by payment of the amount due, the matter must be submitted to the general collection agent, as the case may be, for adjustment, and he can give the order as to what allowance or what compromise may be accepted. All contracts of sale must be made f. o. b. from some point outside of Kentucky, and the goods become the property of the purchaser when they are delivered to the carrier outside of the state. Notes for the purchase price may be taken, and they may be made payable at any bank in Kentucky. All contracts of any and every kind made with the people of Kentucky must be made outside of that state, and they will be contracts governed by the laws of the various states in which we have general agencies handling interstate business with the people of Kentucky. For example, contracts made by the general agent at Parkersburg, West Virginia, will be West Virginia contracts.

" 'If any one of the company's general agents deviates from what is stated in this letter, the result will be just the same as if all of them had done so. Anything that is done that places the company in the position where it can be held as having done business in Kentucky will not only make the man transacting the business liable for a fine of from $100 to $1,000 for each offense, but it will make the company liable for doing business in the state without complying with the require-

ments of the laws of the state. We will therefore depend upon you to see that these instructions are strictly carried out.'

"Taking this as the method of carrying on the affairs of the Harvester Company in Kentucky, does it show a doing of business within that state to the extent which will authorize the service of process upon its agents thus engaged?

"Upon this question the case is a close one, but upon the whole we agree with the conclusion reached by the court of appeals, that the Harvester Company was engaged in carrying on business in Kentucky. We place no stress upon the fact that the Harvester Company had previously been engaged in doing business in Kentucky, and had withdrawn from that state for reasons of its own. Its motives cannot affect the legal questions here involved. In order to hold it responsible under the process of the state court, it must appear that it was carrying on business within the state at the time of the attempted service. As we have said, we think it was. Here was a continuous course of business in the solicitation of orders which were sent to another state, and in response to which the machines of the Harvester Company were delivered within the state of Kentucky. This was a course of business, not a single transaction. The agents not only solicited orders in Kentucky, but might there receive payment in money, checks, or drafts. They might take notes of customers, which notes were made payable, and doubtless were collected, at any bank in Kentucky. This course of conduct of authorized agents within the state in our judgment constituted a doing of business there in such wise that the Harvester Company might be fairly said to have been there, doing business, and amenable to the process of the courts of the state. . . .

"In the case now under consideration there was something more than mere solicitation. In response to the orders received, there was a continuous course of shipment of machines into Kentucky. There was authority to receive payment in money, check, or draft, and to take notes payable at banks in Kentucky. . . .

"We are satisfied that the presence of a corporation within a state necessary to the service of process is shown when it appears that the corporation is there carrying on business in such sense as to manifest its presence within the state, although the business transacted may be entirely interstate in its character. In other words, this fact alone

does not render the corporation immune from the ordinary process of the courts of the state."

So in the instant case. In response to the orders received for the defendant's fire equipment there was a continuous course of shipping the fire equipment into the state of North Dakota and under the contract it was "particularly understood by the salesman that all sales and settlements are to be made in the name of Boyer Fire Apparatus Company and party of the second part further agrees as a part of his duties to promptly make collections in the name of the company on all apparatus and equipment sold by him and to mail the same to the company on the same day collection is made."

Continuing in the International Harvester Co. Case, the court said:

"It is further contended that, as enforced by the decision of the Kentucky court, the law, in its relation to interstate commerce, operates to burden that commerce. It is argued that a corporation engaged in purely interstate commerce within a state cannot be required to submit to regulations such as designating an agent upon whom process may be served as a condition of doing such business, and that as such requirement cannot be made, the ordinary agents of the corporation, although doing interstate business within the state, cannot by its laws be made amenable to judicial process within the state. The contention comes to this: so long as a foreign corporation engages in interstate commerce only, it is immune from the service of process under the laws of the state in which it is carrying on such business. This is indeed, as was said by the court of appeals of Kentucky, a novel proposition, and we are unable to find a decision to support it, nor has one been called to our attention.

"True, it has been held time and again that a state cannot burden interstate commerce or pass laws which amount to the regulation of such commerce; but this is a long way from holding that the ordinary process of the courts may not reach corporations carrying on business within the state which is wholly of an interstate commerce character. Such corporations are within the state, receiving the protection of its laws, and may, and often do, have large properties located within the state." Davis v. Cleveland, C. C. & St. L. R. Co. 217 U. S. 157, 54 L. ed. 708, 27 L.R.A.(N.S.) 823, 30 S. Ct. 463, 18 Ann. Cas. 907; Sherlock v. Alling, 93 U. S. 99, 103, 23 L. ed 819, 820; Johnson v.

Chicago & P. Elevator Co. 119 U. S. 388, 30 L. ed. 447, 7 S. Ct. 254; Kidd v. Pearson, 128 U. S. 1, 23, 32 L. ed. 346, 351, 2 Inters. Com. Rep. 232, 9 S. Ct. 6; Pennsylvania R. Co. v. Hughes, 191 U. S. 477, 48 L. ed. 268, 24 S. Ct. 132; and The Winnebago (Iroquois Transp. Co. v. Delaney Forge & Iron Co.) 205 U. S. 354, 362, 51 L. ed. 836, 840, 27 S. Ct. 509.

In the case of American Asphalt Roof Corp. v. Shankland, 205 Iowa, 862, 219 N. W. 28, 60 A.L.R. 986, a case very much like the International Harvester Co. v. Kentucky, 234 U. S. 579, at page 583, 58 L. ed. 1479, 1481, 34 S. Ct. 944, supra, and the instant case, the Iowa court emphasizes a quotation from the International Harvester case as follows:

" *'Here was a continuous course of business in the solicitation of orders which were sent to another state, and in response to which the machines of the Harvester Company were delivered within the state of Kentucky. This was a course of business,—not a single transaction. . . .'*

"We desire at this point to direct particular attention to the portion of the court's own language printed in italic. The continuous course of business referred to was *the solicitation of orders,* which were sent to another state, and in response to which the machines of the Harvester Company were delivered within the state of Kentucky. The court said, 'This was a course of business,—not a single transaction.' It is true that the above language is followed by a reference to the fact that the agents were authorized to receive notes, drafts, checks, money, etc., and transmit the same to the Harvester Company. Such transactions were, however, merely formal acts, and involved the exercise of no discretion on the part of the agent, and were always referable to transactions closed by the approval of the order, and, no doubt, generally by the delivery of the machines. These transactions are not given significance in what the court terms a continuous course of business.

"The present chief justice of the New York Court of Appeals (Judge Cardozo), in an able opinion in Tauza v. Susquehanna Coal Co. 220 N. Y. 259, 115 N. E. 915, refers to and quotes the identical language from the opinion of Justice Day in the International Harvester Co. Case. The writer of the opinion in the New York case points out the difference in the facts in the International Harvester Co. Case, supra,

and Green Case, 205 U. S. 530, 51 L. ed. 916, 27 S. Ct. 595, and distinguishes them by saying that in the latter case the orders taken did not result in a continuous course of shipments from Illinois to Pennsylvania, the states referred to in the opinion. . . .

". . . it seems to us that the facts disclosed by the record establish that petitioner was, and has been for many years, engaged in a systematic and continuous course of business in the solicitation of orders and the delivery and shipment of merchandise to numerous customers, new and long established, and that such conduct constitutes doing business in this state, within the meaning of that term as used in Section 11072, and as construed and interpreted by the decisions of the Supreme Court of the United States."

The instant case is more nearly like the International Harvester Company case for in the instant case the defendant was engaged in a systematic and continuous course of business in the solicitation of orders and the delivery and shipment of merchandise to numerous customers in the state, and its sales agent, under the regular form sales contract, was authorized to make settlements in the name of Boyer Fire Apparatus Company and it was especially made his duty to promptly make collections in the name of the company on all apparatus and equipment sold by him and to mail the same to the company on the same day collection is made.

Clearly the defendant was doing business in the state, was subject to the jurisdiction of the state courts and there was no error in denying the motion to dismiss.

The remaining question in the case arises on the contract between the plaintiff and defendant. The plaintiff stands upon the contract as it was written; the defendant claims that the contract does not correctly set forth the agreement between the parties; that it was agreed that the defendant was to pay the traveling expenses of the plaintiff while he was working for them, but that the money advanced him as traveling expenses was to be deducted from his commission. The contract is clear and unambiguous. That part of it relating to commissions says nothing about expenses whatever. It is the defendant's usual, customary sales contract for sales agents. At the bottom of the first page there is written in typewriting the following: "The party of the first part agrees to pay the actual traveling expenses of the party of the

second part, party of the second part to render party of the first part a weekly expense account." Now the defendant wants to add to this a further agreement that the expenses advanced to the plaintiff by the defendant are to be deducted from the commissions.

The contract was made at the home office in Logansport, Indiana. It was talked over and agreed to between Mr. Cook, vice president of the defendant company, and the plaintiff and after they had agreed on the terms of the contract, that part relating to expenses was written at the bottom of the first page of the regular form contract by a stenographer. Mr. Cook testified that they agreed that the contract should be reduced to writing. The contract was then written and the question of advancements to be deducted from the commissions was omitted through the stenographer's error. The stenographer, a Miss Edwards, testified that Mr. Cook told her the arrangements with Mr. Wheeler were on the regular commission basis and that all monies sent to him at any time for expenses, or for other purposes, were to be deducted from any commissions that he might earn. Through an error she neglected to write in the contract that the amount of money advanced to him from time to time for expenses, or other purposes, were to be deducted from the commissions. The plaintiff testified that "Mr. Cook dictated one paragraph which refers to the expense account at the foot of page one. It was a form contract. After the contract was drawn the stenographer returned it. Mr. Cook looked it over, signed it and passed it to me, and asked if it was all right, and I said it was and signed it."

The trial court found, as a fact, "That the said contract was properly prepared by the vice-president and managing officer of the defendant, or under his direct supervision. That prior to signing the said contract, the plaintiff read and understood the same, and the vice-president of the defendant read and understood the same, and that in truth and in fact the written instrument carried out and set forth the agreement as reached between the parties in the prior oral negotiations."

"The authorities all require that parol evidence of the mistake and the alleged modification must be most clear and convincing,—in the language of some judges, 'the strongest possible,'—or else the mistake must be admitted by the opposite party. . . . Courts of equity do not grant the high remedy of reformation upon a probability, nor even

upon a *mere* preponderance of the evidence, but only upon the certainty of the error." 2 Pom. Eq. Jur. 4th ed. § 859, pp. 1756, 1757.

We are of the opinion that the evidence sustains the findings of the trial court and the judgment and order are affirmed.

NUESSLE, Ch. J., and BIRDZELL, CHRISTIANSON and BURR, JJ., concur.